**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN L. PAAR**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09 C 5169 |
| v. | ) | |
| | ) | Magistrate Judge |
| **MICHAEL J. ASTRUE**, | ) | Martin Ashman |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John L. Paar ("Plaintiff" or "Mr. Paar") seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Before this Court is Plaintiff's Motion for Summary Judgment.  The parties have consented to have this Court conduct any and all proceedings in this case, including entry of final judgment.  28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c).  For the reasons discussed below, the Court finds that Plaintiff's motion is granted in part and denied in part.

## I.  Legal Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled.  An individual is considered to be disabled when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy.  *Id*.  Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A claim of disability is determined under a five-step analysis. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  First, the SSA considers whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(4)(I).  Second, the SSA examines if the physical or mental impairment is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(4)(ii).  Third, the SSA compares the impairment to a list of impairments that are considered conclusively disabling.  20 C.F.R. § 404.1520(4)(iii).  If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id*.  Fourth, the SSA assesses the applicant's RFC and ability to engage in past relevant work. 20 C.F.R. § 404.1520(4)(iv).  In the final step, the SSA assesses whether the claimant can engage in other work in light of his RFC, age, education and work experience.  20 C.F.R. § 404.1520(4)(v).

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).  The court reviews the entire record, but does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Thus, even if reasonable minds could differ whether the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support.  *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

## II.   Procedural History

Plaintiff filed an application for DIB on August 8, 2005, alleging that he became disabled as of December 31, 2003 from arthritis in his back and post traumatic stress disorder ("PTSD"). The Social Security Administration ("SSA") denied the claim initially and again on reconsideration, following which an administrative hearing was held before administrative law judge ("ALJ") John Mondi on January 3, 2008.  Mr. Paar was represented by counsel.  On April 2, 2008, the ALJ denied Mr. Paar's claim.  Mr. Paar's request for review was also denied, and the ALJ's opinion became the Commissioner's final decision.  Mr. Paar filed this action on August 24, 2009.  After receiving six extensions of time in which to file his motion, Mr. Paar eventually submitted the instant motion on February 2, 2011.

### III.  Factual Background

**A.      Medical History**

Mr. Paar was born on June 16, 1947 and was fifty-six years old at the time of the hearing.

A veteran of the Vietnam War, Mr. Paar has a history of drug abuse that is now behind him,

although he continues to drink and, on occasion, to gamble.  After leaving Vietnam, Mr. Paar

worked as a furniture repairer, a refinisher, and a reupholsterer in his family business. (R. 143,

147).  His earnings grew during the period between 1978, when his annual income was only

$2,602, and 1998, when Mr. Paar earned $20,800. (R. 94).  From that point forward, however,

his earnings rapidly decreased until they were $0.00 for 1997, 1998, and 1999.  In the last year

reported, Mr. Paar earned only $990 in 2003. (*Id.*).

Beginning in 1999, Mr. Paar began to experience pain in his left flank.  A radiological

study performed on March 6, 1999 showed that multiple calcifications were present within his

pelvis, with areas of bony sclerosis involving the left iliac bone. (R. 247).  On January 15, 2004,

he presented at Sherman Hospital in Elgin, Illinois for a radiological exam of his cervical spine.

An x-ray showed that Mr. Paar was also suffering from facet joint arthropathy in the cervical

spine, particularly at the C4-C5 level, that caused some foraminal stenosis.[1] (R. 185).   However,

a further MRI study indicated that there was no evidence of disc herniation, spinal stenosis, or

neural foraminal compromise at any level. (R. 186).  On March 4, 2004, Mr. Paar returned once

more to Sherman Hospital for an x-ray of the thoracic spine.  The x-ray indicated that

degenerative and spondylitic changes were seen throughout that portion of Mr. Paar's spine.

(R. 187).

---

[1] The ALJ mistakenly refers to this study as dated January 15, 2000. (R. 18).

Based on these studies, and Mr. Paar's continuing pain, Dr. Roger Tolentino diagnosed him on June 7, 2004 as having upper cervical radicular syndrome and cervical facet syndrome. (R. 189). He prescribed Vioxx tablets for the pain associated with such disorders and noted that a C4-C5 steroid injection might be necessary if the medication did not provide sufficient relief. Two months later, Mr. Paar reported to Dr. Tolentino that Vioxx had provided considerable relief, with his neck pain reduced from a four to eight out of ten on June 7, 2004 to a two to three out of ten on August 9, 2004. (R. 190).

Mr. Paar was also experiencing breathing problems at this time, and an October 26, 2004 pulmonary function test was ordered to explore the cause of his problems. Mr. Paar's FVC, FEV1, and FEV1/FVC spirometry were found to be normal, thereby indicating normal lung functioning. Overall, he was found to have mild hyperinflation, with moderate gas trapping, as well as arterial blood gases demonstrating elevated carboxyhemoglobin consistent with smoking. (R. 256-57).

On July 17, 2005, Mr. Paar returned to Sherman Hospital complaining of severe lower back pain. Dr. Abitabh Singh found no spondylolisthesis or convincing evidence of spondyloysis, but he did note mild degenerative changes in the lumbar spine. (R. 202-03). One year later, on June 6, 2006, further examination showed prominent facet joint arthropathy in Mr. Paar's cervical spine at the C3-C7 range. (R. 404-05). Foraminal narrowing was indicated at C3-C4, but no degenerative disc changes were seen in the lower thoracic and upper lumbar spine. (*Id.*).

During the period in which Mr. Paar was receiving treatment for problems with his spine, he was also struggling with mental health issues. The record shows that he began receiving

counseling at the Veterans Administration's ("VA") Edward Hines Hospital in 2002 for PTSD, as well as monthly psychotherapy sessions at the VA facility in Elgin, Illinois.  Mr. Paar's primary care physician, Dr. Gary Lewison, began pharmaceutical treatment for depression in mid-2003 by prescribing Zoloft, and then Lexapro.  (R. 372).  By October 2003, Mr. Paar reported that he had been depressed for the three preceding years and was experiencing significant financial and marital stresses.  He admitted to occasional outbursts of anger and to drinking up to seven drinks during the evening.  In addition, Mr. Paar stated that he loved to gamble and that he had accumulated as much as $50,000 in debt doing so.  (R. 320).  As a result, his psychiatrist at the VA hospital, Dr. Michael Kuna, changed his medication from Lexapro to Celexa, and added Lithium to his medication regime. (R. 321).

The record is not clear if his psychiatric consultation was part of a disability claim submitted to the VA, but Mr. Paar was found by that agency in October 2003 to have a 70 percent disability based on a diagnosis of PTSD. (R. 532).  The medical examiner noted that he experienced symptoms of depression, recurrent nightmares, dreams of being shot at, as well as recurring recollections of traumatic scenes and images from his experiences in Vietnam. (R. 533).  Treatment notes throughout 2004 show that Mr. Paar continued to struggle with his symptoms.  In February 2004, he was noted to be very aggressive and argumentative, with extreme mood swings. (R. 460).  By April, however, he was showing improvement, with controlled gambling and drinking limited to one or two drinks per day. (R. 456).  A note dated May 28, 2004 indicates that he was doing better overall, but by October 18, Mr. Paar was once again exhibiting extreme fluctuations in mood. (R. 449, 453).

The records for the first half of 2005 indicate that Mr. Paar experienced some relief from the worst of these symptoms, and he was able to travel to a Carribean island on vacation with his wife.  By July 14, 2005, however, Dr. Thomas Benton noted that he appeared unkempt and sad and that he showed an "extremely poor" memory.  (R. 266).  As described by Dr. Benton:

> Since discharge [from the military], the pt. has experienced repeated flashbacks triggered by loud noises, fire works, helicopter sounds, etc.  He has poor sleep, averaging about 2-3 hrs. per night and often awakes in a cold sweat.  He then does a great deal of pacing.  He experiences nightmares of combat 4-5 times per week. He may attack anyone who awakens him suddenly.  He experiences anhedonia with loss of all past interests.  He is hypervigilant, prefering [sic] to avoid crowds and sits with his back to the wall to observe the door.  He has survivor guilt with passive Suicidal Ideation, no attempts.  He shows emotional blunting.  He isolates himself in the basement and is irritable to the point of getting into many verbal altercations. . . . All symptoms have increased in frequency and intensity by the unstructured time and frustration over continuous Iraq war news.

(R. 266).   Mr. Paar's medications were adjusted, and he was instructed to return for mental health treatment.  Based on Dr. Benton's report, the VA revised its decision and decided that Mr. Paar was 100 percent disabled due to his PTSD, effective as of May 2, 2005. (R. 100).

Treatment notes following Dr. Benton's evaluation show that Mr. Paar experienced ups and downs in his PTSD symptomology.  By August 23, 2005, he showed an improved mood with greater self-sufficiency.  (R. 262).  In 2006, the medical reports from Hines Hospital indicate that Mr. Paar's symptoms were under better control.  He reported on January 18 that his anger was better managed, though he still experienced flashbacks during the day. (R. 417).  His affect was "bright" by March 7. (R. 415).  Between May and July, however, he again reported a depressed mood, flashbacks, and difficulty in sleeping. (R. 407-08).  Feelings of depression were "stable" in August, but increased in September, when Mr. Paar reported that he was drinking two glasses of wine each day followed by two cocktails. (R. 539, 544).  These fluctuations continued

for most of 2007, with ups and downs in March and April, worse in August, and in a "slump" by

November, when Mr. Paar's gambling led to a loss of $10,000. (R. 583, 585, 598). By

December 11, 2007, his drinking had again increased to up to four glasses of wine each day.

(R. 597). In an effort to increase his overall health, Mr. Paar also joined a gym in 2007 and lost

twenty-five pounds. (R. 618).

### B. Physicians' Reports

On October 5, 2004, Dr. John Tomassetti conducted a Psychiatric Review Technique for

the SSA on Mr. Paar. He found that Mr. Paar's mental disorder was classified under Listing

12.06 (anxiety-related disorders). Recurring intrusive recollections were noted, with mild

limitations found in the functional areas of activities of daily living, social functioning, and

concentration. However, no episodes of decompensation were noted. Based on these findings,

Dr. Tomassetti determined that Mr. Paar's impairment was not severe. (R. 377-390).

Dr. Allan Nelson conducted a consultative examination on Mr. Paar on November 1,

2005. Dr. Nelson noted that Mr. Paar had been depressed for five years and had a history of

chronic alcoholism and drug abuse. He noted the daily flashbacks Mr. Paar was experiencing,

together with a chronic loss of self-esteem, insomnia, and difficulty in concentration. Based on

his interview, Dr. Nelson diagnosed Mr. Paar with a mood disorder NOS (not otherwise

specified), possible PTSD and alcoholism, and stated that his prognosis was fair. (R. 391-95).

In addition, state agency physician Dr. Victoria Dow issued a "state agency medical

consultant advice" statement on November 22, 2005, finding that Mr. Paar's lower back pain was

non-severe. (R. 396-97). State agency physician Dr. Ernst Bone, and disability evaluator

Dr. Carl Hermsmeyr, affirmed Dr. Dow's opinion on March 28, 2006. (R. 398-401).

### C.       Hearing Testimony

Mr. Paar testified that he had been self-employed since 1986 as a furniture upholsterer.

He has done very little work since November 2003 other than "gluing" a few kitchen chairs for

$40 or $50 each. (R. 28-29). He was forced to reduce the number of jobs he performed because

his doctor ordered him not to push, pull, or lift objects such as furniture. (R. 30). Mr. Paar

testified that his physical difficulties make it impossible for him to stand for more than fifteen

minutes at a time, and that emphysema made it difficult to climb stairs or to walk even at a slow

pace for more than ten minutes. (R. 31). He can lift up to ten or fifteen pounds, but torn rotator

cuffs in his shoulders make it hard to do so. (R. 31, 38). He demonstrated to the ALJ that he was

only able to lift his arms to the height of his shoulders. (R. 38).

Mr. Paar stated that his symptoms, together with his medication, limit the scope of

activities that he is able to do during a normal day. He experiences lightheadedness from the

hydrocodone he takes for pain, which prevents him from driving often and requires him to lie

down on the sofa for up to four hours each day. (R. 32). He can carry out basic household chores

such as doing dishes or vacuuming, and he is able to cut the grass "sometimes." (R. 34). He

avoids shoveling snow, but if it is an inch or less, he can push it aside without lifting. (R. 34).

His hobbies include reading and science, but he was forced to give up bowling after forty-five

years of enjoying that sport. (R. 34).

His daily activities include going to a recreational center in Elgin, where he uses a stationary bicycle and treadmill for ten minutes. (R. 35, 39). At the time he began using them in 2007, however, he was able to do so for somewhat longer periods of time. (R. 39). Aside from that, he spends most of his day at home or visiting his father in the afternoon. (R. 35). Mr. Paar conceded that he still enjoyed having a "couple" of glasses of wine each evening with his wife, but he denied that drinking had ever been a problem for him at work. (R. 34). He also admitted that he has a "very violent temper" that makes it difficult to be with people at all times.[2] (R. 36).

### D.     The ALJ's Decision

On April 2, 2008, ALJ John Mondi issued his decision finding that Mr. Paar was not disabled. Following the five-step evaluative process, the ALJ found at Step 1 that Mr. Paar had not engaged in substantial gainful activity since his alleged onset date of December 31, 2003. (R. 18). In so doing, however, the ALJ expressed scepticism concerning Mr. Paar's testimony that he had earned less than $4,000 a year since his onset date, given that he had also incurred over $10,000 in gambling debts. *See* Record at 18 ("Significant gambling losses, it is noted, are difficult to reconcile with claimant's testimony of not earning more than $4,000 in any year"). At Step 2, the ALJ determined that Mr. Paar suffered from the severe impairments of arthritis, emphysema, and a history of bilateral rotator cuff tears. He also found that Mr. Paar's mental condition constituted an impairment, but that it was not severe. (R. 18-20). The ALJ found that none of Mr. Paar's severe impairments met or medically equaled a Listing at Step 3, though he

---

[2] Testimony was also given by vocational expert ("VE") Thomas Gustloff. As Mr. Paar does not challenge the ALJ's findings concerning the VE's testimony, the Court omits a summary of Gustloff's statements.

did not identify any specific Listing from Appendix 1 of the regulations. (R. 20). Before

proceeding to Step 4, the ALJ determined that Mr. Paar's testimony was not credible. He also

found that Mr. Paar had the capacity to carry out work at the medium exertional level, but with

postural limitations prohibiting climbing ladders and only occasional overhead reaching.

(R. 20 21). Based on these findings, the ALJ concluded at Step 4 that Mr. Paar could perform

his past relevant work. (R.21). As a result, he did not move to Step 5 and found that Mr. Paar

was not disabled.


## IV. Discussion

Mr. Paar argues that the ALJ erred by: (1) failing to identify all of his severe

impairments at Step 2; (2) not identifying a Listing at Step 3 and making only a perfunctory

analysis of the issues involved at that Step; (3) failing to properly assess his credibility; and

(4) improperly determining his RFC


### A. The Step 2 Issue

At Step 2, an ALJ must determine whether a claimant has a medically determinable

impairment that is severe, or a combination of impairments that is also severe. 20 C.F.R.

§ 404.1520(c). An impairment is not severe if it does not significantly limit an individual's

ability to perform basic work activities. 20 C.F.R. § 404.1521(a). The ALJ in this case found

that Mr. Paar suffered from the severe impairments of arthritis, emphysema, and a history of

bilateral rotator cuff tears. Mr. Paar was also found to have a non-severe mental impairment.

(R. 18-20). Mr. Paar argues that the ALJ erred by (1) failing to consider all of his impairments at

Step 2, (2) not considering the combined effect of his impairments, and (3) not properly applying the "special technique" set forth in 20 C.F.R. § 1520a for the analysis of his mental impairment.

A finding at Step 2 that a medical condition is severe "is merely a threshold requirement." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). By finding one impairment to be severe, the ALJ was obligated to consider the combined effect of all of a claimant's impairments, both severe and non-severe, at later stages. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [claimant's] impairments was 'severe,' the ALJ needed to consider the aggregate effect of this entire constellation of ailments – including those impairments that in isolation are not severe") (emphasis omitted); *see also Raines v. Astrue*, No. 06-cv-0472, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007) ("As long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to label an impairment as 'severe'").

For this reason, the Court does not address Mr. Paar's first two arguments concerning the ALJ's Step 2 discussion at length. He claims that the ALJ overlooked a wide range of medical evidence indicating bony sclerosis, facet joint arthropathy, chronic lower back pain, neck pain, and various other medical issues. According to Mr. Paar, the evidence he submitted on these issues "proves" his case. Without further argument or explanation, however, such evidence fails to demonstrate anything in particular. The ALJ noted Mr. Paar's cervical and lower back problems in his Step 2 discussion, and Mr. Paar fails to explain why the evidence he points to indicates an impairment that is separate from the arthritis that the ALJ found to be severe. Nor does Mr. Paar identify any evidence showing that the other medical issues he raises – including Agent Orange exposure, hernia, and gout – interfered with his ability to work or constituted

disorders that should have been found to be severe at Step 2.  The Court also rejects Mr. Paar's

second argument that the ALJ failed to consider the combination of his various ailments at

Step 2; Paar fails to identify any combination of issues that would allegedly have constituted an

impairment that should have been found to be severe, relying instead on the conclusory claim

that such combinations existed.

That said, both Mr. Paar and the Commissioner raise issues related to the ALJ's use of the

"special technique" that merit closer examination.  When considering whether a mental

impairment exists, the SSA applies the special technique at each level of the administrative

process.[3]  20 C.F.R. § 404.1520a(a).  An ALJ does so by first determining that an impairment

actually exists based on a claimant's signs and symptoms established by the Paragraph A

criteria.[4]  20 C.F.R. § 404.1520a(b)(1).  He then evaluates its severity by reference to the

"Paragraph B criteria" set forth in Listing 12.00C.  20 C.F.R. § 404.1520a(c)(2).  These criteria

include four broad functional areas: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence, and pace; and (4) episodes of decompensation.  20 C.F.R. Pt. 404,

Supbt. P, App. 1 § 12.00C.  The first three of these components must be rated by the ALJ on a

---

[3]  Mr. Paar incorrectly argues that the special technique must be applied at each of the five steps of the evaluative procedure.  Although the special technique applies to each level of the SSA's administrative review, an ALJ is only required to apply it at Step 2 and Step 3 of the five-step evaluation process.  *Craft*, 539 F.3d at 674.

[4]  Mr. Paar erroneously claims that the ALJ did not consider these criteria.  Although the ALJ did not specifically cite Paragraph A, he noted a number of issues that Mr. Paar alleges were overlooked, including daily flashbacks, nightmares, and a variety of symptoms related to Mr. Paar's PTSD and depression.  (R. 19).  As Paragraph A criteria establish the existence of a mental impairment, and as the ALJ found such an impairment (R. 19), remand is not warranted on this issue.  *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (finding that the harmless error rule applies to social security cases).

- 13 -

five-point scale as none, mild, moderate, marked, or extreme. The fourth area is rated on a four-point scale as none, one or two, three, or four and more. 20 C.F.R. § 404.1520a(c)(4). If an ALJ finds that a claimant's limitations in the first three functional areas should be rated as "none" or "mild," together with a finding of "none" in the fourth area, he is entitled to conclude that a mental impairment is not severe unless other evidence suggests a limitation that is more than mild. 20 C.F.R. § 404.1520a(d)(1). An ALJ must specifically indicate the findings for each functional area and incorporate all of a claimant's significant medical history. *Craft*, 539 F.3d at 675.

The ALJ applied this technique to Mr. Paar and determined that he had mild limitations in his activities of daily living, social functioning, and concentration. Mr. Paar claims in summary form that this analysis was flawed because the ALJ failed to give controlling weight to the opinion of his treating physician. However, Mr. Paar fails to state who this physician was or how his or her opinion would have altered the ALJ's analysis. The record shows that Mr. Paar received treatment from a variety of physicians at the Hines VA hospital, including Dr. Michael Kuna, Dr. Pakula Iwona, Dr. Thomas Benton, Dr. Vincent Krasevic, and Dr. Janice Wood. In the absence of any effort by Mr. Paar to identify the relevant physician, the Court declines to discuss the weight that should have been given to the opinions of his various doctors.

Mr. Paar further argues that the ALJ erred by selectively choosing evidence to support his conclusions and by overlooking other evidence that suggests more severe mental limitations than those identified by the ALJ. For his part, the Commissioner contends that all medical records that arose after December 31, 2003 – Mr. Paar's last date insured – are irrelevant because Mr. Paar must demonstrate that he was disabled for twelve continuous months prior to his last

- 14 -

date insured. 42 U.S.C. § 423(c); *see also Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) ("[I]t is . . . necessary to ascertain whether the disability arose prior to . . . when the claimant was last insured").

Both of these arguments are unpersuasive. The ALJ noted a wide range of evidence as part of his special technique analysis that Mr. Paar contends was overlooked, including flashbacks and nightmares, ongoing depression, anger, difficulties in sleeping, problems with alcohol and gambling, and treatment with psychotherapy and medication. (R. 19). Mr. Paar also fails to note that Dr. John Tomassetti conducted a Psychiatric Review Technique on October 5, 2005 that reached the same conclusions as the ALJ concerning Mr. Paar's mental limitations. (R. 377-389). The ALJ also had before him the psychological report of consulting psychiatrist Dr. Allan Nelson, who found "no overt signs of depression, anxiety, or any other abnormalities of affect." (R. 393). As the Commissioner points out, the ALJ stated that he relied on these state agency physicians' findings that Mr. Paar did not have a severe mental impairment. (R. 20).

The Commissioner's objection to evidence post-dating December 31, 2003 ignores the fact that the ALJ himself decided to extend the cutoff date for relevant evidence through the date of the decision. The ALJ found that Mr. Paar's part-time work after that date "seemingly would extend his date last insured" to April 2, 2008. (R. 15). Thus, the ALJ's decision cites several hundred pages of evidence that were created in 2004, 2005, and 2006. Indeed, even the Commissioner relies on evidence post-dating the last date insured by citing the opinions issued by the various state agency physicians, including Dr. Tomassetti's October 2005 report and Dr. Nelson's November 2005 opinion.

- 15 -

For these reasons, remand is not required on the Step 2 issues, and Mr. Paar's motion is denied on this basis.

**B.    The Listing Issue**

Mr. Paar argues that the ALJ erred at Step 3 by failing to identify a Listing and by not providing a meaningful discussion of why Mr. Paar's medical disorders did not meet a listed impairment.  At Step 3, an ALJ must consider whether a claimant's impairments meet or medically equal one of the Listings set forth in Appendix 1 of the regulations.  A claimant's impairment meets a Listing only if it satisfies "all of the criteria for a listed impairment" or the claimant "present[s] medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002) (internal quote and citation omitted).  "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

The ALJ's Step 3 decision in this case is indeed troubling.  In deciding that Mr. Paar's impairments did not meet or medically equal a Listing, the ALJ merely stated: "This conclusion is consistent with the assessments of reviewing state agency physicians.  For example, the claimant's spinal impairment has not caused nerve root compression, sensory or reflex loss, or inability to ambulate unassisted with a normal gait." (R. 20).  The ALJ neither identified a specific Listing nor discussed any impairment other than Mr. Paar's spine disorder.

Notwithstanding, an ALJ's failure to specifically identify a Listing is not always cause for reversible error when his Step 3 discussion is not entirely "perfunctory."  *Rice v. Barnhart*, 384

F.3d 363, 369-70 (7th Cir. 2004). The Court believes that is the case concerning Mr. Paar's arthritis, which presents a disorder related to Mr. Paar's spine. The factors identified in the language used by the ALJ in his brief comments at Step 3 strongly suggest Listing 1.04 (disorders of the spine), which requires a finding of osteoarthritis or facet arthritis, together with nerve root compression, sensory or reflex loss, or an inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 1.04. Mr. Paar himself states that his spine impairment should be considered under that Listing. However, he has not cited any evidence that he suffered from nerve root compression or a loss in sensation or reflex, and Dr. Victoria Dow concluded on November 21, 2005 that he had a normal gait without marked restrictions in the movement of his spine. (R. 396). In the absence of any specific evidence by Mr. Paar on the issue, the Court finds that the ALJ's admittedly brief reference to Mr. Paar's spine condition was not so insufficient that remand is warranted to provide a more complete discussion of the issue.

The same is also true concerning Mr. Paar's mental impairment. The ALJ conducted an appropriate analysis of the special technique at Step 2 to determine that Mr. Paar's mental impairment was not severe. Courts have found that an ALJ need not consider at Step 3 a mental impairment that was found at Step 2 to be non-severe. *Alesia v. Astrue*, 789 F.Supp.2d 921, 932-33 (N.D. Ill. 2011) ("Here, the ALJ need not consider whether Claimant medically equals a listed mental disorder unless he concludes at step two that she has a severe mental impairment"). Given that the ALJ's finding at Step 2 is supported by the medical reports of Dr. Tomassetti and Dr. Nelson, remand is not warranted on his omission of a more complete analysis of the issue at Step 3.

The same cannot be said for Mr. Paar's remaining severe impairments, emphysema and rotator cuff tears. When an ALJ determines that an impairment is severe at Step 2, he is obligated to consider at Step 3 whether it meets or medically equals a Listing. *See Jones v. Barnhart*, 189 F. Supp.2d 806, 809 (N.D. Ill. 2002); *Pilcher ex rel. Pilcher v. Massanari*, 139 F. Supp.2d 966, 969 (N.D. Ill. 2001). Here, the ALJ made no reference to the Listings that apply to these impairments.[5] Unlike the ALJ's brief review of the criteria relevant to a spine disorder, his decision is devoid of any reference to Mr. Paar's symptoms, or the criteria that are relevant to the Listings, concerning emphysema and disorders of the shoulder. The ALJ did state in broad terms that his Step 3 decision was consistent with the state agency physicians' assessment, but no state agency doctor ever evaluated Mr. Paar's rotator cuff tears or emphysema. Thus, no substantial evidence supports the ALJ's conclusion that these severe impairments did not meet or medically equal a Listing.

In the absence of any discussion of this issue by the ALJ, and no response on the topic by the Commissioner, the Court finds that remand is required to remedy the ALJ's oversight. Thus, Mr. Paar's motion is granted on the Step 3 issue, as it concerns his emphysema and torn rotator cuffs.

### C.     The Credibility Issue

---

[5] It is not entirely obvious what specific Listing applies to emphysema. Listing 3.00 (respiratory system) presents an unusually complex and technical set of criteria for respiratory disorders, and the category of impairments set forth in Listings 3.02 - 3.10 do not specifically include emphysema. *See Gammon v. Astrue*, No. 09-0341, 2011 WL 529811, at *3 (W.D. Mo. Feb. 7, 2011) (suggesting that emphysema may be considered a form of progressive chronic obstructive pulmonary disease under Listing 3.02). Clearly, such decisions are for the ALJ, not the Court, to make.

Mr. Paar also argues that the ALJ erred by finding his testimony to be non-credible. A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678. An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements. SSR 96-7p; *see also Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (stating that an ALJ "must articulate specific reasons for discounting a claimant's testimony as being less than credible."). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A reviewing court must be mindful that reversal on this ground is appropriate only if the credibility determination is so lacking in explanation or support that it is "patently wrong." *Elder*, 529 F.3d at 413-14.

With due deference to the ALJ's decision, the Court cannot conclude that substantial evidence supports the ALJ's credibility finding. The ALJ gave great weight to what he perceived as a contradiction between Mr. Paar's testimony that he had not earned more than $4,000 a year since his alleged onset date of December 31, 2003, and the fact that he had also incurred more than $10,000 in gambling losses. The ALJ mentioned this issue twice in the decision and noted that the two statements were "difficult to reconcile." (R. 18). Yet the ALJ failed to consider that Mr. Paar had sources of income after December 31, 2003 other than his wages as a furniture refinisher. The VA found him to be 70% disabled and entitled to a monthly income of $1,158 as of October 1, 2003; that amount was raised to $2,429 on June 1, 2005, when Mr. Paar was found

- 19 -

to be 100% disabled. (R. 100, 534).  The ALJ took no note of these payments.  Moreover, Mr. Paar testified that his wife was employed as a financial analyst for Chase Bank.  The ALJ made no inquiry at the hearing concerning the degree to which Mr. Paar funded his gambling sprees with his own disability income, or if he drew on funds that might have been provided by his wife.

The ALJ also failed to consider the fact that Mr. Paar's testimony was entirely consistent with his past history of accumulating gambling debts that greatly exceeded his earned income. The record shows that between the years 1997 and 2003, Mr. Paar only earned more than $4,000 in 2000 – and then only by $934.  (R. 94).  He reported an annual income of $0.00 in 1997, 1998, 1999, and 2002.  (R. 94).  Despite such sparse earnings, Mr. Paar told his physician in October 2003 that he was $50,000 in debt because of his gambling habit. (R. 320).  The ALJ's assumption that Mr. Paar paid for his gambling habit out of his current income fails to explain how Mr. Paar could have spent $50,000 in 2003 when his average annual income from 1997 through 2003 was $1,214.  Without seeking any explanation from Mr. Paar on this issue, the ALJ was not entitled to discount Mr. Paar's credibility because his claimed earnings after 2003 were less than the $10,000 in gambling debts he accumulated during that period.

The ALJ also relied on what he viewed as a contradiction between Mr. Paar's testimony concerning his drinking and the record evidence on this issue.  The ALJ stated that "his denial of a drinking problem is difficult to reconcile with reports in the record of heavy drinking, such as the report on June 27, 2006 of 2-3 glasses of wine followed by cocktails when his wife gets home." (R. 20).  The record does show that Mr. Paar has a history of excessive drinking.

- 20 -

However, Mr. Paar did not claim that he did not have "a drinking problem," at least in the broad

sense stated by the ALJ. Instead, the following exchange took place:

> Q:     All right. There are references to alcohol abuse. Do you still drink?
> A:     Yes, I do.
> Q:     Is this, has this been a problem for you at work or in your —
> A:     Never. No, I have a couple glasses of wine with my wife at night with
>        dinner now.

(R. 34). Mr. Paar's only denial was directed to the ALJ's specific question of whether his

drinking had ever interfered with his work.[6] Nothing in the record suggests that it did, and the

Commissioner points to no evidence that contradicts Mr. Paar's claim on this issue. Mr. Paar did

not deny that he had a history of "alcohol abuse," as the ALJ inferred; he merely stated that, at

the moment, he was drinking in moderation. The record is clear that Mr. Paar's drinking habit

waxed and waned, often significantly. On some occasions, Mr. Paar drank up to seven drinks

per night. (R. 320). At other times, he had only one drink, or none at all. (R. 301). Moreover, an

alcohol screening test performed on April 3, 2007 showed that Mr. Paar's typical alcohol

consumption was one to two drinks per day, just as he stated at the hearing. (R. 616).

An ALJ is "not obliged to believe all [of a claimant's] testimony" and "is free to discount

the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*,

449 F.3d 804, 805 (7th Cir. 2006). But that is just the problem with the ALJ's decision in this

case: he gave no indication that he discounted Mr. Paar's testimony on this issue based on the

complex record relating to it. An ALJ is obligated to consider the degree to which a claimant's

testimony is consistent with other parts of the record. SSR 96-7p. Here, the ALJ cited one

---

[6] Mr. Paar's testimony that he drank in the evening is amply supported by the record.
(R. 320, 410, 417, 591, 607). As the evidence on this issue repeatedly shows, Mr. Paar drank
during the evening, rather than during the day, in order to help him sleep.

- 21 -

adverse note concerning drinking, but he took no notice of significant evidence that was fully consistent with Mr. Paar's testimony. The ALJ was obligated to consider more than a single example of heavy drinking, or at least to question Mr. Paar further concerning his drinking habits, before finding that he denied having a "drinking problem."

Social Security Ruling 96-7p also requires an ALJ to consider the location, frequency, and intensity of a claimant's pain, the medication given to treat it, and any potential side effects. SSR 96-7p. The ALJ recounted some of Mr. Paar's testimony on his medication, but he did not evaluate these statements in light of any record evidence, failing even to note Mr. Paar's testimony concerning his medication's side effects. The ALJ did consider Mr. Paar's activities of daily living, as SSR 96-7p requires, but discrepancies between the record and the ALJ's decision also arise as part of this analysis. The ALJ discounted Mr. Paar's testimony, in part, based on the ALJ's belief that Mr. Paar could "run" on a treadmill for ten minutes. However, Mr. Paar never stated that he ever ran; instead, he agreed with his attorney's statement that he could walk on a treadmill for up to ten minutes, the same time he claimed that he could ordinarily walk unassisted.

The Court notes that this is not a case in which the ALJ found that the claimant's testimony was only partially credible, which is often the conclusion reached in cases of this type. Instead, the ALJ rejected Mr. Paar's statements in their entirety as "not credible," without placing any limitation on the extent of their believability. But the record shows that significant portions of Mr. Paar's statements were fully consistent with the medical record. In addition to the issues discussed above, Mr. Paar testified to some of the symptoms of his PTSD such as anger, and the record abundantly corroborates his statements on this issue. Multiple therapy notes record his

- 22 -

struggle with anger management and other PTSD and depression symptoms. As noted earlier, the VA had determined that Mr. Paar was 70% disabled because of PTSD as of his last date insured, and that he was 100% disabled as of the hearing date. Mr. Paar also testified that his rotator cuff tears limited his ability to raise his arms, and the ALJ himself appears to have included that limitation as part of the RFC by restricting him to "occasional overhead reaching." (R. 21). The ALJ's blanket rejection of Mr. Paar's testimony is difficult to square with the ALJ's own acceptance of such RFC testimony. Insofar as the ALJ meant to reject only part of Mr. Paar's testimony, he failed to state his intention to do so, to explain the basis of his reasoning, or to build an "accurate and logical bridge" from the evidence to his conclusion. *Craft*, 539 F.3d at 673.

For these reasons, Mr. Paar's motion is granted on the credibility issue.

### D.      The RFC Issue

Finally, Mr. Paar argues that the ALJ's RFC determination is not supported by substantial evidence. The ALJ found that Mr. Paar had the exertional capacity to perform medium work involving the ability to lift fifty pounds occasionally and twenty-five pounds frequently. (R. 20). In support, the ALJ referred to no portion of the record at all, stating instead that he adopted the opinions of the state agency physicians that allegedly assessed Mr. Paar as having such a RFC.

Contrary to the ALJ's  statement, no state agency physician ever concluded that Mr. Paar had the ability to perform work at the medium level. The Commissioner cites the brief comments by Dr. Dow and Dr. Bone to support the ALJ's RFC decision, but such reliance is seriously misplaced. These physicians stated only that Mr. Paar's back pain was nonsevere; they

- 23 -

did not determine any exertional or nonexertional restrictions that might have stemmed from

Mr. Paar's spine problems, and they did not consider his severe impairments of rotator cuff tears

or emphysema at all. (R. 396). Moreover, despite the fact that Dr. Dow concluded that

Mr. Paar's spine did not present a severe limitation, the ALJ disagreed with this conclusion by

finding at Step 2 that Mr. Paar's arthritis *was* severe. (R. 18). Thus, even if Dr. Dow's report

could be construed as a RFC assessment, the ALJ appears to have rejected it on this issue, and he

was obligated to explain his reasons for doing so. *See* SSR 96-8p ("If the RFC assessment

conflicts with an opinion from a medical source, the adjudicator must explain why the opinion

was not adopted").

Instead of basing the RFC on medical evidence, it is clear that the ALJ created his own

RFC based on his assumptions of what Mr. Paar could do. Courts have consistently found such

an unsupported finding concerning the RFC to be an improper act of "playing doctor." *See*, *e.g.*,

*Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *26-27 (Nov. 18, 2011); *Bailey v.*

*Barnhart*, 473 F. Supp.2d 822, 839 (N.D. Ill. 2006) (finding that an ALJ who creates a RFC

without supporting medical evidence plays doctor); *see also Norris v. Astrue*, 776 F. Supp.2d

616, 637 (N.D. Ill. 2011) ("The ALJs are not permitted to construct a 'middle ground' RFC

without a proper medical basis"). Moreover, SSR 96-8p requires an ALJ to provide a narrative

discussion of how the evidence supports his RFC conclusions, including the claimant's ability to

sustain work activities on a continuing basis. SSR 96-8p. In this case, the ALJ's decision

contains no discussion at all of the relation between the RFC of medium work, the record itself,

or how Mr. Paar would be able to carry out medium work on an ongoing basis.

A RFC assessment must also consider the combined effect of all the impairments a claimant has, "even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The failure to consider the aggregate impact of both severe and non-severe impairments warrants reversal. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). Here, the ALJ gave no indication that his RFC analysis included the mild mental limitations found at Step 2 in Mr. Paar's activities of daily living, social functioning, and concentration. Social Security Ruling 96-8p makes clear that such limitations determined at Step 2 under the special technique are not a substitute for a RFC finding. "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments[.]" SSR 96-8p. The failure to consider the combined effect of a non-severe mental limitation, together with a claimant's other severe impairments, warrants remand. *See Alesia*, 789 F. Supp.2d at 933; *Muzzarelli*, 2011 WL 5873793, at *24. On remand, the ALJ shall comply with this requirement by addressing the aggregate impact of all of Mr. Paar's severe and non-severe impairments. Mr. Paar's motion is granted on the RFC issue.

## V.   Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

_____

**MARTIN C. ASHMAN**

**Dated:** January 17, 2012.                    United States Magistrate Judge